IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  21-cr-00188-RBJ-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ANTHONY ZAGHAB,

    Defendant.

---

**GOVERNMENT'S RESPONSE TO SENTENCING MEMORANDUM OF DEFENDANT AND REQUEST FOR VARIANT SENTENCE, ECF 18**

---

The United States of America, through undersigned counsel, hereby responds to defendant's Sentencing Memorandum and Request for Variant Sentence in which he argues for a variant sentence of 24 months of home confinement. ECF 18. The probation department is recommending a custodial sentence of 24 months and the government will argue at the November 8, 2021 sentencing hearing for a sentence of 33 months in prison, consistent with the plea agreement, ECF 11.

## I.  Offense Conduct

As set forth in the plea agreement, *id.,* the defendant submitted ten fraudulent Economic Injury Disaster Loan applications (EIDLs), which resulted in his receiving five EIDL loans totaling **$517,300**. One of these loans was submitted in the name of his deceased father. These funded fraudulent applications also resulted in him receiving **$31,000** in Economic Injury Disaster Grants (EIDGs). *Id.* at 9. The defendant also

1

submitted numerous false EIDL/EIDG applications in the names of fake companies he created and in the names of his mother, sister, and wife that were declined or denied by the SBA, but still resulted in the defendant receiving EIDGs ranging from $5,000 to $10,000 each for a total of **$35,000**. *Id.* at 11.[1] All told, the defendant received **$66,000** in EIDGs to which he was not entitled.

As set forth in detail in the plea agreement, the false statements made by the defendant in these applications included grossly inflating the amount of revenue, cost of goods sold, number of employees, and lies about when the businesses were established. *Id.* at 9-11.

Each time the defendant submitted a fraudulent EIDL/EIDG application, he was required to click affirmatively on the following attestation:

> CERTIFICATION AS TO TRUTHFUL INFORMATION: By signing this application, you certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future. WARNING: Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C 636(b). In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may

---

[1] His sister resides in the United Arab Emirates, and his mother did as well prior to her recent death. ECF 19 at 11, ¶ 60.

increase if amended by the Federal Civil Penalties Inflation
Adjustment Act Improvements Act of 2015.

☐ I hereby certify UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES that the above is true and correct.

SBA Office of Disaster Assistance | 1-800-659-2955 | 409 3rd St, SW. Washington, DC 20416

[2]

The defendant also submitted four fraudulent applications for Paycheck Protection Program (PPP) loans, which resulted in the defendant receiving a total of **$83,330**. ECF 11 at 12.[3] Each time he submitted a fraudulent PPP application, he was required to click affirmatively on the following attestation:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.[4]

The defendant made the conscious decision to violate the law each time he submitted a fraudulent application and falsely verified that the information he was submitting was true and correct. He had plenty of opportunities to stop, yet he

---

[2] This attestation is taken from the June 23, 2020 EIDL application for a business called "Zippy Document Preparation & Tax," which forms the basis of the count of conviction. ECF 11 at 13. This application is attached hereto as Exhibit 1 with appropriate redactions.
[3] Two of these successful PPP applications were submitted in the name of the defendant's sister.
[4] This attestation is taken from the June 29, 2020 PPP application for a business called "Anthony Zaghab." ECF 11 at 11. This application is attached hereto as Exhibit 2 with appropriate redactions.

3

continued. Between June 2020 and February of 2021, the defendant fraudulently obtained a staggering **$666,630** in PPP, EIDL, EIDG funds. In addition, between April and July 2020 the defendant applied for and received **$41,511** in unemployment insurance funds in his family members' names without their knowledge or consent (and claimed a back date for benefits to March).

The defendant claims he engaged in this fraud to support his family during the pandemic, but that it "got out of hand." ECF 18 at 6. This much is clear. Submitting even one fraudulent application for funds to which he was not entitled would have been illegal, but here, the defendant did much more. He went far beyond illegally securing funds to support his family during the pandemic. He used approximately $280,000 of the approximately $700,000 to pay down the mortgage on the family home. ECF 18 at 5. While he did return $120,070 to the United States Secret Service, *id.* at 6, this still leaves approximately $300,000 in fraud proceeds unaccounted for.[5]

Moreover, the defendant's claim that he engaged in this fraud to support his family is undercut by his history of underemployment prior to the pandemic and currently. He reported to the probation officer that he currently earns $1,000 per month at his smoke shop and works only Tuesday through Friday. ECF 19 at 13-14, ¶¶ 78, 79. The defendant states that he pays $500 to his wife each month for her to learn how to

---

[5] The probation officer noted it does not appear the defendant used these funds for home furnishings or repairs. His love of travelling, though, is made clear through comments made by the defendant's wife and the number of past timeshare agreements in the defendant's name for timeshares in locations throughout the United States. ECF 19 at 69, 87.

start an on-line store. *Id.* at 11, ¶ 63. As the probation officer notes, it is impossible to support a family of six on this amount. ECF 19-1, R-4. This defendant has a bachelor's degree and full-time work should be available to him in this economy where employers are desperate to find employees.

## II.  A Sentence of Home Confinement Does Not Comply with the Purposes Set Forth in 18 U.S.C. § 3553(a).

The defendant argues that the Court should allow him to remain living at home and continuing "to work so he can meet his restitution obligations in a meaningful way." ECF 18 at 7. However, given his current income and his family to support, it is unclear how the defendant will be able to pay any sum of money towards restitution if he were granted home confinement.[6] Accordingly, his stated reason for home confinement falls flat. Even if he did have the means to make substantial payments toward restitution, this fact would not justify the lenient sentence he seeks. *United States v. Sample,* 901 F.3d 1196, 1200 (10th Cir. 2018) (holding district court's sentence of probation was substantively unreasonable where it based this sentence on the defendant's ability to make restitution payments). In any event, a sentence of home confinement would not reflect the seriousness of this offense or afford adequate deterrence to criminal conduct. A good portion of the American public is essentially on "home confinement," by living and working from home due to the pandemic. Allowing a defendant who stole over

---

[6] Indeed, the defendant told the probation officer he is unwilling to liquidate his "long-term investments" in cryptocurrency to pay toward his restitution obligation, and as of the writing of the PSI, had yet to sell any of his six vehicles. ECF 19 at 15, ¶ 92 and page 16; ECF 19-1 at R-4.

$700,000 to stay home except for work would fail to address the seriousness of this offense and would send no message of deterrence to him or the public.

Defendant next argues a sentence of home confinement is warranted due to the impact a prison sentence will have on his wife and children. The defendant failed to consider the consequences of his actions when he decided to repeatedly apply for pandemic relief funds to which he was not entitled. Indeed, the "families of incarcerated defendants are commonly the ones who suffer most." *United States v. Sherrills,* 432 F. App'x 476, 488-89 (6th Cir. 2011); *see United States v. McClatchey,* 316 F.3d 1122, 1131 (10th Cir. 2003) ("[d]isruptions of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration"); *United States v. Gonzalez-Lopez,* No. CR 11-3002, 2012 WL 3150350, at *9 (D. N.M. Jul. 27, 2012) ("[t]he Court sentences to incarceration many defendants whose families suffer significant harm from their imprisonment. . . . The Court does not see anything that takes this case out of the heartland of cases"); *United States v. Baylor,* No. 06-40090-01-RDR, 2007 WL 2407280, at *1 (D. Kan. Aug. 21, 2007) ("[t]here is little question that every family suffers when a member is incarcerated"). The hardship this defendant's family will suffer in the event of a custodial sentence is not unique to this defendant and should not serve as the basis of a sentence of home confinement.

The defendant's argument that fraud defendants receive unduly harsh sentences is equally unpersuasive. ECF 18 at 11-13. For every case cited by the defendant there are an equal number of cases that hold the opposite: white collar defendants are often

held to one standard while every other defendant is held to another. "Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Morgan,* 635 F. App'x 423, 457 (10th Cir. 2015) (unpublished); *see also id.* at 445 ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime"); *see also United States v. Yurek,* No. 15-cr-394-WJM, 2020 WL 3415371, at *1 (D. Colo. June 22, 2020) ("white-collar criminals have historically received quite lenient sentences") (citation omitted); *Sample,* 901 F.3d at 1201 ("In imposing minimal sentences on white-collar criminals, courts 'raise concerns of sentencing disparities according to socio-economic' status") (citations omitted).

In any event, the need for a message of deterrence in these cases is great. "White collar criminals may be particularly susceptible to general deterrence because '[d]efendants in white-collar crimes often calculate the financial gain and risk to loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Sample,* 901 F.3d at 1200 (citations omitted); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (same); *see Morgan,* 635 F. App'x at 457 (noting that deterrence "is particularly important in the area of white collar crime").

Finally, the defendant's lack of prior criminal history, conduct while on bond, his acceptance of responsibility, and low risk of recidivism, "considered cumulatively, do not justify the extent" of the variance he seeks. *Sample,* 901 F.3d at 1201; *see also id.* at 1200 ("[T]he

7

Congress that adopted the 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense").

### III. The Defendant's Medical Condition Does Not Warrant Home Confinement.

The defendant next argues that COVID and his medical condition all counsel in favor of a sentence of home confinement.

The defendant's age of 52 and his Type-II diabetes do not qualify as "extraordinary physical impairments" warranting home confinement instead of incarceration. U.S.S.G. § 5H1.4. The defendant is vaccinated, meaning that severe infection or death from COVID-19 is extremely unlikely.

The CDC reports that as of October 18, 2021, more than 189 million Americans have been fully vaccinated. Within that group, only approximately 41,127 hospitalizations from symptomatic "breakthrough infections" were reported, and approximately 10,857 deaths (0.0057%).[7] A CDC COVID Data Tracker collecting information on COVID-19 hospitalizations from 14 states shows that, for adults 18 and older, the COVID-19-associated hospitalization rate was about 12 times higher in unvaccinated persons.[8] And for adults aged 50-64, the cumulative rate of COVID-19-associated hospitalizations in unvaccinated adults was about 15 times higher than fully

---

[7] https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (accessed Oct. 26, 2021).
[8] https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination (accessed Oct. 26, 2021).

vaccinated adults. *Id.* Notwithstanding the defendant's vaccination status, his age of 52 does not place him at high risk of severe illness. Rather, according to the CDC, "More than 81% of COVID-19 deaths occur in people over age 65. The number of deaths among people over age 65 is 80 times higher than the number of deaths among people aged 18-29."[9]

Finally, even the BOP study that the defendant cites involving a federal prison in Texas indicates that only four of 172 infected people were hospitalized, and only one of those four was vaccinated. ECF 18 at 10. The one person who passed away was unvaccinated.[10] These data suggest that a vaccinated person faces a far lower level of risk from COVID-19 than that faced by prisoners and all other persons from myriad other ailments and hazards of daily life. Accordingly, the defendant has not shown an "extraordinary physical impairment" warranting home detention under U.S.S.G. 5H1.4.

### IV.   Conclusion

For the reasons set forth above, the government submits that the defendant's motion for a variant sentence of 24 months of home confinement should be denied. At sentencing, the government will seek a sentence of 33 months in prison, followed by three years of supervised release, a restitution order in the total amount of **$708,141** (to

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed Oct. 26, 2021).
[10] https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e3.htm?s_cid=mm7038e3_wts (accessed Oct. 26, 2021).

be credited with funds returned), a final order of forfeiture,[11] and a $100 special assessment fee.

                          Respectfully submitted,

                          MATTHEW T. KIRSCH
                          Acting United States Attorney

                          By: *s/ Martha A. Paluch*
                          Martha A. Paluch
                          By: *s/ Rebecca S. Weber*
                          Rebecca S. Weber
                          Assistant United States Attorneys
                          United States Attorney's Office
                          1801 California Street, Suite 1600
                          Denver, Colorado 80202
                          Telephone: (303) 454-0100
                          Fax: (303) 454-0409
                          E-mail: Martha.Paluch@usdoj.gov
                          E-mail: Rebecca.Weber@usdoj.gov
                          Attorneys for the United States

---

[11] A status conference is scheduled in this civil action on November 16, 2021. Case No. 21-cv-01400-STV.

## CERTIFICATE OF SERVICE (CM/ECF)

      I hereby certify that on October 29, 2021, I electronically filed the foregoing with the Clerk of Court using the ECF system that will send notification of such filing to all parties of record.

      /s *Martha A. Paluch*
Martha A. Paluch
Rebecca S. Weber
Assistant United States Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Martha.paluch@usdoj.gov
Rebecca.weber@usdoj.gov